IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION


UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )  Criminal Docket
                                     )
JOSE ALFREDO HURTADO IBARRA,         )  No. 8:22-cr-115-SDM-TGW-06
                                     )
            Defendant.               )
_____     )


Transcript of Sentencing


Heard in Courtroom 15A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Monday - September 29, 2025
9:14 a.m. - 10:53 a.m.


BEFORE THE HONORABLE STEVEN D. MERRYDAY

UNITED STATES DISTRICT JUDGE


REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Chambers 15A
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES


PRESENT ON BEHALF OF THE PLAINTIFF,
THE UNITED STATES OF AMERICA:

 **Lauren N. Stoia**
 Assistant U.S. Attorney
 OFFICE OF THE U.S. ATTORNEY
 400 North Tampa Street, Suite 3200
 Tampa, Florida 33602
 (813) 274-6000
 lauren.stoia@usdoj.gov


PRESENT ON BEHALF OF THE DEFENDANT,
JOSE ALFREDO HURTADO IBARRA:

 **David Anthony Nunez**
 MEYER & NUNEZ, P.A.
 135 San Lorenzo Avenue, Suite 620
 Coral Gables, Florida 33146
 (305) 722-9898
 david@nunez-law.com


Also Present: **Jennifer Fogg**, United States Probation
Officer

    **Jesse Leonor** Spanish Interpreter

PROCEEDINGS

(Open court.)

(Defendant present.)

(Court called to order.)

THE COURT:  Well, good morning.  Perhaps counsel, the defendant, and the interpreter will step forward to the clerk's table, and anyone else present may be seated.

Well, good morning.  We are together in Case 22-criminal-115, United States of America versus Jose Alfredo Hurtado Ibarra.

I guess one administrative question.  This is off the record, Madam Reporter.

(Off-the-record discussion.)

THE COURT:  All right.  Back on the record.

I note the presence of an interpreter, and I would ask the deputy clerk to administer to him the oath of an interpreter.

(Oath administered to interpreter, Jesse Leonor.)

THE INTERPRETER:  I do, so help me god.  My name is Jesse Leonor, L-e-o-n-o-r.

Good morning.

THE COURT:  Good morning, Mr. Leonor, and thank you for being with us.

THE INTERPRETER:  My pleasure.

THE COURT:  Who speaks for the United States?

MS. STOIA:  For the United States, Lauren Stoia. Good morning.

THE COURT:  Good morning.

And who speaks for the defense?

MR. NUNEZ:  Your Honor, may it please the Court, David Nunez on behalf of Mr. Hurtado Ibarra, who stands to my left and is present today with the assistance of an interpreter.

THE COURT:  All right.  Good morning, Mr. Nunez.

And you are Jose Alfredo Hurtado Ibarra.

THE INTERPRETER:  Yes.

THE COURT:  Good morning.

THE INTERPRETER:  Good morning.

THE COURT:  Well, Mr. Hurtado Ibarra, on April 24 of this year you pleaded guilty to Count One of an indictment. Count One charges you with conspiracy.  In particular, Count One charges a conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the United States, all in violation of parts of Section 70503 and 70506 of Title 46 of the United States Code.  I earlier entered an order that accepts your plea of guilty and that adjudges you guilty of the conspiracy offense charged in Count One.  As of the entry of that order, your guilt was determined and it remains this morning to determine your sentence.

I will determine your sentence by first determining an advisory sentence in accord with the United States Sentencing Guidelines, and by next inviting both the United States and the defense to direct my attention to any matter, including those at 18 U.S.C. 3553(a), that I should consider in arriving at a final and reasonable sentence in accord with applicable law.

I'll begin by asking Ms. Stoia if she's had an opportunity, on behalf of the United States, to review and evaluate the presentence report and, if so, whether the United States objects either to the factual content of the presentence report or to the application of the sentencing guidelines that is recommended by the United States Probation Office.

MS. STOIA:  Your Honor, I've had an opportunity to review the PSR in this case.  The United States has no objections, but we also do not oppose defense counsel's objection to the imposition of the aggravating role, the four points.  Instead, I'll be asking the Court to depart upwards under Application Note 2 to 3B1.1.

THE COURT:  All right.  So your half of this problem, you have no objection to the offense level of 41 and the criminal history category of I, and no objection to the factual content.

MS. STOIA:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Nunez, have you and Mr. Hurtado Ibarra had an opportunity together to review and evaluate the presentence report?

MR. NUNEZ:  Yes, sir, Your Honor, we have.

THE COURT:  Mr. Hurtado Ibarra, have you seen the presentence report and discussed it with your counsel?

THE INTERPRETER:  Yes, Your Honor.

THE COURT:  Then, first, Mr. Nunez, is there -- well, I know that there is.  I see that you have some objections to the factual content of the presentence report.  Do you want to be heard on any of those now?

MR. NUNEZ:  Yes, Your Honor.  Thank you.

THE COURT:  Well, let's deal with them one at a time, and you may begin.

MR. NUNEZ:  I'd like to first thank the Court for accommodating my health issue in continuing this matter.  I'm not out of the woods yet, but I'm good enough to be here, and so thank you for that, Your Honor.

THE COURT:  You look good.

MR. NUNEZ:  Don't let the outside fool you.

Okay.  We have several objections.

May I just inquire?  If I understood, the government is not objecting to our objection to the aggravated role, which means that the extra two points for importation also would not apply.  Does the Court still wish me to proceed on the

objections?

THE COURT:  Well, you have just stated your objection.  The United States has no objection -- stipulates to the objection, I suppose is a good way to put it.  So the consequence of that is in paragraph 40.

MR. NUNEZ:  In the PSR, Your Honor?

THE COURT:  Yes.

MR. NUNEZ:  Let me check.

THE COURT:  Is that right?  May I inquire with the officer?

MS. FOGG:  Paragraph 40 is the aggravating role.

THE COURT:  So that would go to zero?

MR. NUNEZ:  It's actually -- if I could just look at the record.  It's in paragraph 40 and 43.

THE COURT:  Well, I was dealing with one at a time, because one is a consequence of the other, I believe.

MR. NUNEZ:  Yes, sir.

THE COURT:  First, 40 would go to zero from plus two.  And then, as a result of that, the other consequence is where?

MR. NUNEZ:  It's actually the reverse, Your Honor, and I apologize.  It's -- the adjustment in paragraph 4 is what triggers the adjustment in paragraph 40.

MS. STOIA:  43.

MR. NUNEZ:  I'm sorry, 43.  Yes, 43.

THE COURT:  So the adjustment for the role in

paragraph 43 goes to what, Ms. Stoia?  It's plus four right now.

MS. STOIA:  That's correct, Your Honor.  Well, I think, under the guideline, it would be zero, and I'm asking the Court to depart upwards --

THE COURT:  Wait just a minute.

MS. STOIA:  Sure.

THE COURT:  We can't do everything at once.

MS. STOIA:  So it goes to zero.

THE COURT:  That's the point I was making.  So the United States agrees that paragraph 43 is a zero?

MS. STOIA:  Yes.

THE COURT:  And how about paragraph 40?

MS. STOIA:  That would also be zero.

THE COURT:  So that is a reduction of six points in the offense level to 35?

MS. STOIA:  It is, Your Honor.  And I think there are further implications with respect to safety valve and zero-point offender.

THE COURT:  All right.  Well, I'm sure there are.

MS. STOIA:  Okay.

THE COURT:  So why don't we -- first of all, Mr. Nunez, you have other objections?

MR. NUNEZ:  I do.

THE COURT:  All right.  Let's go through them and see

which ones are agreed or which consequences are agreed.

MR. NUNEZ:  I apologize in advance if my objections delve into -- or relate to the aggravated roles that were just agreed would not be part of his calculation.  I'm anticipating the argument for the upward departure.

THE COURT:  Well, let's get the guideline calculations done.

MR. NUNEZ:  Okay.

THE COURT:  Did you -- are you meaning departure or variance?

MS. STOIA:  I believe, under the guideline, it says an upward departure.

THE COURT:  Based on what?

MS. STOIA:  Based on the defendant's management responsibility over an asset of the organization.

THE COURT:  Okay.  And that's under what guideline?

MS. STOIA:  3B1.1, Application Note 2.

THE COURT:  All right.  Well, let's get that first. Let's first get the base calculation correct, and then come back to that.

MS. STOIA:  Okay.

THE COURT:  Now, we're at 35 -- offense level 35.  Do you have any objection to that?

MR. NUNEZ:  No, sir.

THE COURT:  All right.  So the United States wants an

upward departure under 3B1.1, Note 2.

MS. STOIA:  Yes, Your Honor.

THE COURT:  All right.  Go ahead.

MS. STOIA:  Your Honor, 3B1.1, Application Note 2, provides that an upward departure may be warranted for someone who may not have directly supervised another participant but who nevertheless exercised management responsibility over the property, assets, or activity of a criminal organization.

Here, per the terms of the defendant's stipulated facts and the notice of max penalties, the defendant claims that he acted as a broker connecting drug owners or the sources of the cocaine supply to transportation organizations; here, the Miller Valencia transportation organization.  He was essentially acting as an agent of the source of supply with the Miller Valencia organization and, as probation noted, he controlled the flow of funds between the source of supply and this organization.

He gave Miller Valencia the money that Miller Valencia and his group needed in order to carry out the transportation of the cocaine.  In recorded phone calls with Miller Valencia, he said that he would tell Miller when he would provide Miller with the money for various expenditures, including engines.  On one occasion, he told --

THE COURT:  Ms. Stoia, I don't mean to interrupt you. What we have done here has gotten ahead of ourselves and become

disorganized.  And I'm going to reimpose a sense of organization to this sentencing the way -- I think the most rational and organized way about -- to go about these, is to first ask the United States whether the United States agrees to the facts in the guideline calculation, because they almost always do.  That takes care of half of the problem.  Then the other half of the problem is to determine whether the defense counsel and the defendant have reviewed the presentence report, and if the answer to that is yes, then to determine there is an agreement on the facts.

So right now we are arguing about a two-level upward adjustment to the guidelines, and we don't yet have an agreement on the facts, so we will come back to that.  And I apologize for yielding to the temptation to try to cut things short, because then almost every time you actually cause yourself to make things endure even longer.

So I am going to come back, and I have affirmed that both the defense counsel and the defendant have reviewed the presentence report.  And my question to the defendant -- to defense counsel was whether there was any objection to the factual content of the presentence report, not yet to the guideline calculation --

MR. NUNEZ:  Yes, sir.

THE COURT:  -- but to the factual content that's recited in the presentence report.  So let's deal with that.

MR. NUNEZ:  Yes, sir.

The first objection is the characterization of my client, Mr. Hurtado Ibarra, as a member of a drug trafficking organization.  The defense's position and the evidence, as well as the PSI, do not support that contention.

Mr. Hurtado Ibarra is an independent contractor that did not belong to any organization.  The Rodriguez Valencia brothers ran the transportation crew independent of Mr. Ibarra.  In fact, the PSI shows that there were eight interdictions of which Mr. Ibarra was only a participant in two of those ventures; so six of them didn't involve him.  So he definitely was not a member of the Rodriguez Valencia transport organization.

The owners of the drugs, the investors, were above Mr. Hurtado Ibarra.  He was not an investor in any load.  He was an intermediary and a middleman between the drug investors/owners and the drug transporters, earning a commission based upon the fee that the Rodriguez Valencia organization imposed.  How?  If they, for example, charge a hundred dollars per transport, he would add a percentage, which I don't know what that is, on top of the hundred, and that's how he would earn his funds.  And so he was not a member, per se, of a DTO, Your Honor.

I'll save the case law for later, but I have case law where this objection is made, and it's important for the Court

to understand his actual role.

Secondly, we object --

THE COURT:  Well, let's deal with this one first --

MR. NUNEZ:  Yes, sir.

THE COURT:  -- or we'll have a long line of things and we will introduce yet more confusion to this matter.

Ms. Stoia.

MS. STOIA:  Can I ask counsel where in the PSR he's referring to?  Is he referring to paragraph 5?

MR. NUNEZ:  Yes, of course.  Paragraph 5.

THE COURT:  I don't see anything in there that characterizes him as a member of a drug trafficking organization.  It says he was involved with a drug trafficking organization.

MS. STOIA:  That's the government's point, Your Honor.

MR. NUNEZ:  If the government's position is that he's not a member, then the objection is withdrawn.

THE COURT:  The government's position is that paragraph 5 says he was involved with a drug trafficking organization, whatever "involved" means.  So...

MR. NUNEZ:  Yeah, to me it was ambiguous.  And so because they're bunching him together with the other actual members of a DTO, I thought it was important for defense to demonstrate or show the Court that he's not properly lumped

together with those folks that are and do form a DTO.

THE COURT:  I don't think any of them are called members.  So, respectfully, that objection is overruled.

MR. NUNEZ:  Okay.  Your Honor.  Thank you.

We object to paragraph 9, where the PSR describes Mr. Ibarra as coordinating the bulk transportation of cocaine through the maritime smuggling operation managed by the Rodriguez Valencia brothers.  My client was not a coordinator; he was a facilitator.  All aspects of the transport, every single one, from the recruitment of mariners to the purchase of equipment to the actual dispatch to the drafting of the coordinates for transport were all managed and operated by Rodriguez Valencia.

My client's role is clearly defined as follows: Received funds from the drug investors and delivered the funds to the transportation crew.  Beyond that, he informed the transportation crew of the destination port, and then he was present at the dispatch of those two loads to confirm that the drugs actually were dispatched.

So he played no role in coordinating the transport of the drugs.  He was a classic middleman, as I highlight in my objections of record in docket entry 195, Your Honor, my objections to the PSR.  And so the evidence shows that he did not coordinate bulk transportation.  He brokered transportation services; the coordination was at the hands of the Rodriguez

Valencia organization.

THE COURT:  All right.

Ms. Stoia, what says the United States?

MS. STOIA:  I agree with counsel on -- I agree with counsel that his client performed the actions that he just described.  I also think there are phone calls in which the defendant and Miller Rodriguez were discussing engines for these vessels, the cost of the engines, and the location of the engines.  Now, is that considered --

THE COURT:  Where in the record is the evidence of that?

MS. STOIA:  Your Honor, this is in discovery.

THE COURT:  Well --

MS. STOIA:  My point is that --

THE COURT:  -- I don't -- whatever your point is going to be, my point is, where is it in the record?  And you say it is in the discovery.  I don't --

MS. STOIA:  Your Honor --

THE COURT:  Are you going to offer something here this morning?

MS. STOIA:  In the stipulated facts section of the notice --

MR. NUNEZ:  Your Honor, it's in the PSR, page 9, the sixth bullet point down.

THE COURT:  Yes.  I have it underlined, having read

it this morning.

MS. STOIA:  Additionally, Your Honor, in the stipulated facts portion of the notice of maximum penalties, on pages 4 to 5, there's a discussion --

THE COURT:  This was the basis of his plea agreement.

MS. STOIA:  It was, Your Honor.

THE COURT:  So in the stipulated facts that he admitted at the plea colloquy, he says what?

MS. STOIA:  It says that he was lawfully intercepted over Colombian telephone communications from October 27th, 2020, to November 7, 2020, intercepted speaking with Miller Rodriguez Valencia concerning preparations for an upcoming smuggling event.  More specifically, Miller Rodriguez Valencia and the defendant discussed the items that needed to be purchased and their cost for the transport of drugs, including securing the drugs, vessel, fuel, and engines, among other things.

So I just want to make it clear that the defendant was assisting in procuring the tools necessary.  Whether or not that's considered coordination -- I think coordination as a term is probably a bridge too far, but I just wanted to clarify.  So to the extent that coordinating does not include those actions --

THE COURT:  Well, the characterization is useless; the facts are what is important.  I don't know the difference

between facilitation and coordination.  I don't think any human being can specify that.

MS. STOIA:  Okay.

THE COURT:  There's nothing in the inherent denotation or connotation of those terms that would resolve definitively this distinction, so therefore, in the face of that ambiguity, we repair to what?  The facts.  Since we don't have witnesses, one way or the other, we have to deal with the stipulated facts and the ones that are not contested, so, hence, I call your attention to the facts upon which the plea was based and to which the defendant made an admission.  All right.

MR. NUNEZ:  May I address the plea?

THE COURT:  You may.

MR. NUNEZ:  Thank you, Your Honor.

So in the plea, there is the intercepted telephone call.  It's consistent with his role as a broker.  He's paying the transportation crew for their transport services.  One of the cases I cited, *U.S. v. Alred*, Eleventh Circuit, 144 --

THE COURT:  Just wait a second.

MR. NUNEZ:  Yes, sir.

THE COURT:  We're objecting here --

MR. NUNEZ:  Yeah.

THE COURT:  -- to what factual statement?

MR. NUNEZ:  I want to show the Court that

negotiations concerning deliveries between a broker and a transporter are incidental to the broker relationship. It's not an outside factor that would make his conduct worse.

THE COURT: We don't have brokerage contracts in this sort of organization, so using terms like someone is a broker, again, that has no specific definition. We either deal with what he was doing, not the character -- the attempt to characterize what he was doing. What he was doing, he admitted. The characterization of it, I don't know how important that really is.

What I asked you originally, if you objected to the factual content of the presentence report, and you directed my attention in this instance, I believe, to paragraph 9. Is that right?

MR. NUNEZ: Yes, sir.

THE COURT: That's what we're currently discussing.

MR. NUNEZ: Yes, sir.

THE COURT: It says that he facilitated transport brokering services for investors engaged in cocaine trafficking and coordinated the bulk transportation of cocaine through the maritime smuggling operation managed by Rodriguez and Valencia.

You don't object to that, do you?

MR. NUNEZ: Well, Your Honor, I do.

THE COURT: What is your objection? The definition of the word "coordination"?

MR. NUNEZ:  Well, to me it denotes active participation in the logistics.  He didn't procure -- contrary to the government's statement to the Court just now, he did not procure --

THE COURT:  The government quoted the stipulated facts.

MR. NUNEZ:  The government used a term and said he procured equipment.  He did not.  He paid the transport crew who procured all the equipment.  All they did was convey to him what they procured; that doesn't make him a procurer.  It's different.  To coordinate is active -- it's an active verb. You're actively involved in organizing and structuring.  He never procured a single thing.  Now, granted --

THE COURT:  You mean he didn't go to the store and buy it himself?

MR. NUNEZ:  He didn't buy it.  But on one occasion --

THE COURT:  He just paid for it.

MR. NUNEZ:  No, no, no.

On one occasion, one of the Rodriguez Valencia brothers asked him to pick up a phone at a store that they bought, and he did pick it up and delivered it to them at their instruction because they couldn't make it to the store.  One incident standing alone does not, to me, merit him being a coordinator of anything.  And when Your Honor speaks about there not being any broker agreements, I appreciate your

observation, but these --

THE COURT:  Well, I just meant it's not a formal -- it's not a very helpful term from which to derive specifics. It does not denote any specifics.

MR. NUNEZ:  I'll try to specify.  The roles in these conspiracies --

THE COURT:  When you say an offensive coordinator for a football team, he does everything.

MR. NUNEZ:  Yes, he does.  That's a good analogy.

THE COURT:  He has supervision over everything.

MR. NUNEZ:  Right.  So to use that analogy --

THE COURT:  But there are other sorts of coordinators -- there are coordinators all over the place. There are coordinators in the government who do, best I can tell, nothing.

MR. NUNEZ:  I agree with that statement.

Your Honor, I lost my train of thought.  Your joke was too funny.

THE COURT:  Well, it wasn't a joke, it was a statement that we keep returning to the term "coordinator" as if it was a fact to be proven.

MR. NUNEZ:  Okay.

THE COURT:  It is a conclusion, and it's a characterization, and it is an ambiguous one.

MR. NUNEZ:  Yes.

THE COURT: So he clearly, under, I think, what are the undisputed facts, was involved -- it's very difficult to do this, isn't it, until I have the facts right in front of me so that I get every word correct. But he was intimately involved in the implementation of this conspiracy's objectives.

MR. NUNEZ: With all respect, I don't know that I would say "intimately." Like I said, he procured --

THE COURT: I didn't ask you whether you would agree with "intimately." If you don't agree with that, we'll just have to argue into perpetuity what intimate means. It has to do with lovers under the sheets, and it has to do with a close familiarity with intimate knowledge of the offensive scheme of the Bucs. It can go from the sublime to the ridiculous. So I don't want to chase those things, I want to deal with facts.

MR. NUNEZ: Understood, Your Honor.

THE COURT: I'm not going to engage in useless lexicographic quarrels.

MR. NUNEZ: I don't mean to be difficult. The thing is --

THE COURT: Yeah. I just want to get the discussion to a basis where we can make a resolution.

MR. NUNEZ: Yes, sir.

THE COURT: And arguing, no, he was the facilitator, no, he was a coordinator is pointless and futile.

So the United States read from the stipulated facts,

which I think are the only ones that I have in front of me at the moment. So it says he, at paragraph 9 -- I'll give you a couple more minutes on this -- that he received funds from drug investors, he delivered them to cover the costs of services and related expenses, including the procurement of vessels, engines, supplies, or profited by making a commission. It seems to me -- what is your objection to that? It says provided funds for the procurement of vessels, engines, and supplies.

MR. NUNEZ: No objection to that portion, Your Honor.

THE COURT: Well, that's what it says.

MR. NUNEZ: No objection; that's what he did.

THE COURT: All right. Do we have an objection to No. 9 -- paragraph 9?

MR. NUNEZ: I had it. Your Honor, deems it a semantic issue --

THE COURT: What was your objection?

MR. NUNEZ: The use of coordinator, that's all. We've covered that.

THE COURT: All right. Overruled.

MR. NUNEZ: Thank you, sir.

THE COURT: Have you another factual objection?

MR. NUNEZ: Yes, sir.

THE COURT: All right, sir.

MR. NUNEZ: Your Honor, I want to apologize in

advance. I'm trying to lay a record in case we appeal. And so in doing that, I'm trying to honor your request to stick to the facts while at the same time doing all I can to highlight ambiguities in the PSR that I present as objections, because this may go up on appeal; I don't know.

THE COURT: Well, sir, I want to give you every opportunity to object, and in a -- to anything that you want to object to.

MR. NUNEZ: I don't want to frustrate the Court.

THE COURT: I am not --

MR. NUNEZ: Okay.

THE COURT: Mr. Nunez, are you trying to make a record that you are not getting a fair hearing this morning?

MR. NUNEZ: No, sir.

THE COURT: I am not frustrated in the slightest.

MR. NUNEZ: Okay, okay.

THE COURT: I am trying to direct you toward the facts. Because what we are trying to do right now is determine whether there are objections to the facts so that we can have a factual basis to make a determination on the applicable guidelines.

MR. NUNEZ: I never intended to suggest --

THE COURT: This is something I've done a thousand times, and so have you.

MR. NUNEZ: Yes.

THE COURT: So right now I'm focused on the facts and asking what are your objections to the factual content of the presentence report?

And now we've finished with paragraph 9, and I'm asking you what your next objection is.

MR. NUNEZ: Paragraph 17.

THE COURT: All right, sir.

MR. NUNEZ: I have an objection because of the ambiguity to the second sentence; that while at the site, meaning dispatch site, the defendant provided a satellite phone and navigational coordinates to one of the mariners. This objection is preserved in my PSR. Would you like me to leave it there?

THE COURT: What's the basis for your objection?

MR. NUNEZ: That it's ambiguous. Because one could read that as though he brought the satellite phone pre-programmed and the coordinates to the dispatch site; that's not what happened. He was present at the site to confirm that it actually went out visually. And one of the Valencia Rodriguez brothers asked him, "Hand this to this person," and he did. He didn't know what was on the paper, he never prepared the coordinates, never delivered them to the Valencia brothers; they delivered it themselves. So for me, it's simply an objection to clarify that he did not bring these to the dispatch site. He handed them at the site at the instruction

of one of the brothers.

MS. STOIA:  May I, Your Honor?

THE COURT:  You just said that he did not bring these to the site?

MR. NUNEZ:  Correct.  As in on his person from wherever he was.  They were -- the Valencia --

THE COURT:  They were already at the site; is that your point?

MR. NUNEZ:  Yes, sir.

THE COURT:  All right.  Ms. Stoia.

MS. STOIA:  Perhaps we can resolve that by changing the word "provided" to "handed."

MR. NUNEZ:  Yes.

MS. STOIA:  Okay.

MR. NUNEZ:  That was my objection in the filing. Thank you.

THE COURT:  All right.  Then we will change "provided" to "handed."  So that objection is granted to that extent.

And you have another objection, Mr. Nunez, to the factual content?

MR. NUNEZ:  I'm reviewing, Your Honor, because my objections were mostly based on the aggravated role, so I'm trying to go through my list of objections so that I don't --

THE COURT:  All right.  Take your time.

MR. NUNEZ:  Thank you, sir.

Your Honor, in the government's response to my objections, that would be --

MS. STOIA:  Those are not the government's response.  Those are from probation.

MR. NUNEZ:  Oh.  Okay.

Well, I'd like to address probation's response to my objection.

THE COURT:  Well, what -- you need to identify an objection.  We've resolved the objections so far, so I assume there is an objection.  What is that objection?

MR. NUNEZ:  This one is more particular.  It's that he coordinated logistics.

THE COURT:  Are you addressing that to some paragraph in the presentence report?

MR. NUNEZ:  Just let me find it for one second.  Thank you.

No, sir.  I was addressing it just in the response; it's not in the PSR.

My next objection would be paragraph 28 in the PSR, "A single mariner identified Mr. Ibarra as a leader of the organization."  I know we've agreed on no aggravated role, but I think that needs to be rectified in that paragraph, because he was not a leader.

THE COURT:  I believe that the presentence report, in

paragraph -- you said 28, right?

MR. NUNEZ:  Yes, sir.

THE COURT:  28 does not state that he was a leader. It states that he was reported by a mariner that he was perceived by a mariner that he was a leader.  So I think that is an accurate statement.  So that objection is due to be overruled.

MR. NUNEZ:  Your Honor, I'm sorry, back to paragraph 5.  The entire last sentence, beginning with "The DTO dispatched cocaine via low profile vessels."  There's nothing I've received that shows that LPVs were used in this transport. In fact, if there were, it could have been an enhancement, I believe two points.  I think that's factually incorrect.

THE COURT:  Ms. Stoia.

MS. STOIA:  Your Honor, on December 17th, the vessel dispatched was a low profile vessel.  That's not a seizure attributed to the defendant, and those -- that quantity of drugs is not included in the base offense level calculation. And so there was an LPV on December 17th, 2019.  It in no way affects this particular defendant; he was not assessed two points for it.

THE COURT:  Okay.  I think that's correct.

MR. NUNEZ:  Yes, sir.

THE COURT:  The probation office uses a single narrative in a multi-defendant case for convenience, but this

is not attributed to this defendant, so overruled.

MR. NUNEZ:  Thank you, Your Honor.

The only other objection would be to the guideline calculation.

THE COURT:  All right.  Then if there are no further objections to the factual content of the presentence report, the factual content, as amended this morning and in response to the objections of the defense, is adopted.

Now, you have another guideline --

MR. NUNEZ:  Yes, sir.

THE COURT:  -- objection.

MR. NUNEZ:  We're at 35, if I understand.

THE COURT:  Yes.

MR. NUNEZ:  We would take off three points total for acceptance of responsibility, two for safety valve, and two for no criminal history would leave Mr. Ibarra at a guideline of 33.

THE COURT:  Okay.  He has three acceptance points deducted.  In paragraphs 47 and 48, he gets full credit for acceptance of responsibility.

MR. NUNEZ:  Right.

THE COURT:  And then Chapter 4, he does not receive -- well, I understand your objection to be 46 -- paragraph 46?  And I think he will not qualify for that, because he was part of a continuing criminal enterprise.  So I

think, if my recollection is correct, that's disqualifying for that component.

Do I have that right, Ms. Stoia?

MS. STOIA: Your Honor, may I have one moment to look at 4C1.1?

THE COURT: Sure. That's a good thing to look at on the record.

MS. STOIA: Yes, of course.

THE COURT: Mr. Nunez, do you want to be heard any further?

MR. NUNEZ: We're looking at the statute that defines criminal enterprise -- continuing criminal enterprise.

THE COURT: I see.

MR. NUNEZ: Thank you, sir.

So, Your Honor, I don't believe that probation -- well, let me rephrase that. I believe he does qualify for 4C1.1, a continuing criminal enterprise -- would you like me to read the statute?

THE COURT: You may read it if you like.

MR. NUNEZ: Okay.

THE COURT: But if you do, read it at a pace that the reporter can report what you're saying.

MR. NUNEZ: Yes, sir.

A "'Continuing criminal enterprise' defined," under 848 -- sorry -- Title 21 United States Code Section 848 defines

"'Continuing criminal enterprise,'" in subsection (c), "For purposes of subsection (a), a person is engaged in a continuing criminal enterprise if -

"(1) he violates any provision of this subchapter or subchapter II the punishment for which is a felony, and

"(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II -

"(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

"(B)" -- in the conjunctive -- "(B) from which such person obtains substantial income or resources."

Based on subsection (c)(1)(2)(A), Mr. Ibarra, and based on the stipulation of the parties, is neither an organizer, supervisor, or manager so that 4C1.1, respectfully, I would submit applies in this case.

THE COURT:  Ms. Stoia, what says the United States?

MS. STOIA:  I tend to agree with counsel if part of the definition is that the person occupies a position of an organizer, a supervisory position, or any other position of management.  I mean, it is our -- it's the government's argument that he managed the assets, as I've described, but I'm not sure that that's what this subsection is contemplating. And so if we're not objecting to the aggravating role, I think

I agree with counsel's position.

THE COURT:  Well, if the United States agrees with that, then he will get a negative two there; is that correct?

MR. NUNEZ:  Yes, Your Honor.

THE COURT:  And that would reduce the offense level to 33?

MR. NUNEZ:  And then we have paragraph 41, I believe, safety valve, negative two there.

THE COURT:  So it would come down to 31?

MR. NUNEZ:  Yes, sir.

THE COURT:  Is that right, Ms. Stoia?

MS. STOIA:  I believe so.  Yes.

THE COURT:  All right.

MR. NUNEZ:  So paragraph 49, just for the record, would be total offense level 31.

THE COURT:  That's what the United States has agreed to --

MR. NUNEZ:  Yes, sir.

THE COURT:  -- giving a particularly narrow definition to management.

MR. NUNEZ:  Shall I go on to the next objection?

THE COURT:  Is it directed to the guideline calculation?

MR. NUNEZ:  It's paragraph 78.  Yes, Your Honor.

THE COURT:  Paragraph 78.  Well, let me find my way

over to 78.  Well, that of course is just the consequence of the other.

MR. NUNEZ:  Yes.

THE COURT:  So it's now 31 and I, and it's 108 to 135.  Is that what it is?

MR. NUNEZ:  Yes, sir.

THE COURT:  Is that right, Ms. Stoia?

MS. STOIA:  Yes, Your Honor.

THE COURT:  All right.  Then any other objections, Mr. Nunez?

MR. NUNEZ:  Just one second.  Thank you.

No, no objection to what is stated in the PSR, Your Honor.

THE COURT:  All right.  Then we can adopt the criminal history I and offense level 31?

MR. NUNEZ:  Yes, sir.

THE COURT:  And that is adopted, I think, as it almost -- as it turned out, almost-- well, anyway.  31 and I.

All right.  And I did not see a motion under 5K1 on behalf of this defendant.  Is that correct?

MS. STOIA:  That's correct.

THE COURT:  And the United States -- you can elaborate later.  The United States will ask for what sentence?

MS. STOIA:  210 months.

THE COURT:  With that in mind, Mr. Nunez, I'll

recognize you to advance any matter in mitigation or any matter under 3553, after which I'll recognize the defendant in allocution, and then the government again briefly.

MR. NUNEZ:  Yes, Your Honor.  Thank you.

Your Honor, the defendant debriefed here in the United States, I believe, on two occasions.  He's not warranting a 5K motion, Rule 35, because he had limited knowledge, but he disclosed everything that he knew about the ventures in which he participated, and it's a factor the Court can take into account to show his characteristics in terms of remorse and willingness to assist the government in any way that he could.

Additionally, the PSR describes his life.  He's clearly made a very serious series of mistakes for which he is paying dearly for.  Nevertheless, he did maintain lawful, gainful employment.  He has a family that he misses dearly.  He is in a foreign jurisdiction with no visitation, will not have any.

The conditions at the prison in which he was detained pending extradition are what I would define, and I've been there many times to the actual yard where he was at, uninhabitable in some ways.  The food has maggots in it, there's essentially no healthcare, no hygiene products are provided to the inmates.  Those conditions are conditions that this circuit has recognized as meriting a variance.

He has no criminal history, and whatever sentence this Court hands down today, whether it's lower than the low end of the guideline due to a variance or above it, it's substantial time that he will be in this country without visitation and paying for the harm he's done.  He repents for it.  He asks this Court to exercise its discretion and vary downward so that he gets a sentence -- let me look at my computation -- 88 months.

The nature of this conspiracy is important.  There's no question the amount of drugs is substantial.  But given what I'm hearing about what the government is asking for, it's important to keep in mind the role that he played.

Would you like me to present that now or in response to their request for an upward departure?

THE COURT:  Either way.

MR. NUNEZ:  Okay.  So the case law that I've cited in my objections, *U.S. v. Alred*, 144 F.3d 1405, provides, among other things, that negotiating delivery as a middleman is simply incidental, quote, to the buyer-seller relationship; in this case it's the middleman-transport relationship.

It also provides, and I quote, on page 1422, "We have held that a convicted defendant status as a middleman or distributor is insufficient for a 3B1.1 enhancement which requires authority in the organization that perpetrates the criminal conduct, the exertion of control, or leadership."

*U.S. v. Yates*, 990 F.2d 1179 -- and all these cases are Eleventh Circuit -- also provides that the mere status of a middleman or distributor does not support enhancement under 3B1.1.

I understand, we're not asking for an enhancement, but this is a very close cousin asking for an upward departure. It's important to note that one of the leaders of the transport org. received 240 months. The government is asking for only 30 months less for Mr. Hurtado.

The PSI reflects the fact that the Valencia brothers -- excuse me, Your Honor -- "recruited the mariners and crew for the ventures, had engines installed, purchased equipment, had underlings recruit mariners, paid them, provided radios and maps outlining smuggling routes, coordinated with the captain of a GFV in preparation for a maritime drug smuggling venture, paid the captain, and operated" -- in paragraph 27 -- "operated the trafficking organization."

Relative to Mr. Ibarra's conduct, where he is a classic middleman and exercised none of the factors in the notes of Section 3B1.1 -- there are seven of them -- there's nothing that shows he had decision-making authority or anybody in any of the ventures. When we discuss the nature of his participation, he facilitated the transport, that's undisputed. There's no evidence that he recruited any person at all in either venture. There's no evidence that he was entitled to a

larger share of the profits.

Concerning his degree in participation and planning and organizing, that's an important one there, because he hired the transport crew, but he was a middleman who did not plan. He passed along information from the planners to those that executed the plan. That's to be distinguished from having a position of authority where he himself could set things in motion or dictate how something is done.

He couldn't -- he had no authority concerning what equipment to buy, where to buy it, how much to pay for it, coordinating logistics, meaning creating them or procuring them, neither of those. We spoke about recruitment; none. Never spoke to the sellers, didn't speak to the crew while they were at sea.

So he truly is the classic middleman whose participation was limited to passing money, passing along the port where the drugs should be received, and visiting the dispatch site to make sure that the drugs actually left to sea. He bore no responsibility if a load was interdicted. He was not an investor. Never touched cocaine, didn't help load a boat.

These distinctions between him and the Valencia brothers -- Rodriguez Valencia brothers and the investors are significant. He did not exercise any degree of control and authority. And the idea that he managed assets, meaning the

money, case law that I have, *U.S. v. Lozano-Hernandez*, 89 F.3d 785, provides that financing transport does not merit any kind of leadership role.  This is incidental to any negotiation to move drugs.

The case that's most on point is *U.S. versus Martinez*.  In this case, assets were managed, not people, but assets.  The case law provides also that *Martinez*, quote, orchestrated the delivery of drugs, utilized others to receive and send drugs through the mail.  The district court gave him an aggravated role, and the appellate court said this is not enough.  I'll read from the case.  I'm looking for the page number; my apologies.

Commencing on 1027.  Accordingly, the only undisputed facts upon which the district court could have properly based its role enhancement determination are these:  Martinez, quote, orchestrated, unquote, drug shipments.  Martinez was directly involved in the wire transfer of $343,729 of drug proceeds, (there was a total of approximately $650,000 of drug proceeds involved in this case), and Martinez, along with co-conspirators, quote, utilized other individuals, end quote, to mail and receive drug shipments.  Those facts are not enough.  They do not establish, standing alone or in concert, any of the seven factors set forth in Comment 4 to Section 3B1.1, which I've just read to the Court.

And so this defendant stands in distinct contrast to

both the investors and the gentlemen that ran the transport crew, who controlled every aspect of it. Mr. Ibarra had no control over anybody, no supervisory authority over anybody, or decision-making authority. And the case law that I've described to the Court shows that the negotiation of delivery is incidental to his role, not a ground to -- in this case, it was an enhancement, but there was neither a departure sought, financing transport, as *Lozano-Hernandez* was also not a basis to increase his guideline range, and the middleman, which is what he is, also not a basis. Negotiating deliveries is not.

And so based on what Mr. Hurtado Ibarra actually did, I think it's inappropriate to depart from 108 months to 210, which is a 102-month departure, which might as well be a level-two aggravated role. Mr. Ibarra has not committed the level of participation in the planning and organization that would merit such a departure, Your Honor.

Thank you.

THE COURT: All right. Thank you.

Mr. Hurtado Ibarra, you do have an opportunity to speak on your own behalf this morning. You're not required to say anything, but if you'd like to say something, I'd be happy to hear from you now.

THE INTERPRETER: Yes. Yes, Your Honor.

I know that I've committed some actions, some -- that are unlawful, and I recognize that. And I ask that Your Honor,

in your wisdom and knowledge, that you would be just with regards to my sentence.

Thank you for listening to me, Your Honor.

THE COURT: All right. Thank you, sir.

All right. Ms. Stoia, what says the United States?

MS. STOIA: First, with respect to the case law that counsel cites, *Martinez* and the *Lozano-Hernandez* case, as he finally came around to explain to the Court, those cases analyzed the application of the four-level aggravating role -- assessment of aggravating role and at no point discusses an upward departure for management of assets. And so I don't think they have any bearing on what I'm asking the Court to consider with respect to an upward departure for the management of assets.

We've spent a lot of time today trying to distinguish this defendant from other defendants in this particular case. And I want to talk about what this defendant actually did, which was he controlled the money for this organization. He was the one who passed the money from the drug supplier to the Miller Valencia organization, and counsel wants to make it sound as though he had no control.

He controlled everything. He controlled the money. Without the flow of money, there are no engines, there are no boats, there's no paying mariners, nothing of that kind. He was a trusted member of both parties, the sellers of the drugs

and the Miller Valencia organization. Over the intercepts, he's repeatedly talking to Miller Rodriguez Valencia, the head of that organization. He's acting as an agent of the seller at the launch site. And as counsel stated, he knew where the launch site was and he also knew what the departure point was. So he had intimate knowledge because he was a person of trust to both sides of the equation there. Without him, you have that break in the chain.

Counsel talked about the defendant's proffer. He was perfectly truthful about what he participated in, but he didn't have much to say about the sellers of this cocaine, which would have been incredibly helpful to the government. Who is creating this cocaine? Where are the labs? Anything that he knew about that.

And, you know, if we do, lastly, want to talk about how we distinguish this defendant from the others, I would just draw the Court's attention to the parts of the PSR that talk about the fact that he received some college education, which is in stark contrast to most defendants we see in these cases. He grew up in a two-parent home. None, of the, you know, tragic poverty that we see, where there's no running water or electricity, or, you know, enough food to fill their bellies. So this defendant had opportunity and he didn't have to resort to working with these drug trafficking organizations in such a position of trust.

You know, probation makes a good point, that in their response to counsel's objections in the PSR, the defendant admits that he would inflate the costs of some of these services and products to the seller, and that's how he would earn his commission.  And think about that.  He must have been very comfortable in his position to be so embolden as to overcharge cocaine suppliers in such a way.

And so I think we just disagree on the import of his participation in the organization.  I think that he served a critical role.  I think he managed the major -- one of the major assets of the organization, the other being the cocaine, but here the money that ensured the flow of that cocaine, and so I'm asking for an upward departure.

MR. NUNEZ:  May I respond, Your Honor?

THE COURT:  I think you already have, but, yes, you can, again, if you like.

MR. NUNEZ:  Two points -- particular points.

THE COURT:  All right.

MR. NUNEZ:  The notion that he controlled the money; it wasn't his money.

THE COURT:  I understand.

MR. NUNEZ:  And if the sellers pay the transporter directly, they control the money, so anybody in his position controls the money.  In every transaction, someone controls the money, whether it's the seller or the person in the middle.

That is not the kind of control that's contemplated by the guidelines.  And the managing of assets, although it's not a basis for an aggravating factor --

THE COURT:  You're just saying delivering money is not controlling the money.

MR. NUNEZ:  Correct.  It wasn't his money.  We're backdooring the fact that we can't get aggravated role here because the case law and facts don't support it, which I appreciate on behalf of the government conceding that.  We're backdooring it by asking for a departure of over a hundred months.

She's used the word -- the government used the word "trusted" member.  I don't think anybody in this business trusts anybody.  If that money is lost, he wouldn't be here. He's not a trusted member.  He was a middleman who delivered funds to the Rodriguez Valencia crew.

To say he was an agent of the seller at the launch site, he wasn't an agent of anybody.  He was covering himself, because if later someone says, "Oh, the load got seized," but it didn't because it was never sent, he wouldn't be here today. He wasn't there for them, he was there for him, to make sure that the services for which he delivered funds were actually carried out.

The notion that he manipulated or had the audacity to charge above what the transport crew charged, it's understood.

He wasn't stealing from anybody. This is the world of comisionistas, which is a phrase to mean commission earners, whether it's the cocaine, there's a middleman between the cook and the buyer of the cocaine, he makes a commission. There's nobody scamming anybody here. So the notion that that somehow elevates his status as being brazen and lying to the sellers of the cocaine, it's not the case. On the street, the reality is, everybody makes a cut off the next level, and that's why it starts off costing 2,000 Colombia and 25,000 U.S. per kilo.

Like *Martinez*, in the case I cited, Mr. Ibarra never met face to face with the cocaine seller and only knew their aliases. He gave all that information in the debriefs. He knows very well that if he had that information, it would help him hopefully obtain a reduction via 5K or Rule 35. He didn't withhold information, he doesn't have it. He made it very clear, and there's no evidence that he's ever had face-to-face meetings or knows their real name.

The PSI references one telephone call. One. There's no other evidence for the Court to consider about various phone calls. I have discussed what that phone call was about.

So I respectfully disagree with the government's characterization that all of these factors combined warrant a departure that doubles essentially his sentence. I think it's absurd, I think it's disparate sentencing given the fact that the actual leaders of the organization were the ones that

dictated everything.

And just one more point, Your Honor. If money is everything, then the money laundering laws would be equal to the drug smuggling laws, and they're not. They're based on amount. If money is everything, there would be no disparity between a money launderer and a drug smuggler in a conspiracy. The money is important, of course it is, but his role with respect to the money is carrying it here and bringing it over here. It wasn't his money. He never invested in a single load. And so Congress has spoken. The money is not equivalent to the drugs. They're separate. He handled money, he didn't handle drugs.

Thank you.

THE COURT: Thank you, sir.

All right. Anything further from the United States?

MS. STOIA: No, Your Honor.

THE COURT: Any reason not to proceed to sentence?

MS. STOIA: No.

THE COURT: Anything further from the defense?

MR. NUNEZ: No, sir.

THE COURT: Any reason not to proceed to sentence?

MR. NUNEZ: No, Your Honor.

THE COURT: Did you get to make every argument you wanted to make?

MR. NUNEZ: Yes, sir. Thank you.

THE COURT:  Did I prevent you from --

MR. NUNEZ:  No, sir.

THE COURT:  -- advocating in any way?

MR. NUNEZ:  No.

THE COURT:  If I do -- you said you were concerned about frustrating me, and I assure you, you're not capable of frustrating me.  I've been at this too long.  I don't think the devil himself could frustrate me.  I'm not comparing you to the devil --

MR. NUNEZ:  I've never been before Your Honor.

THE COURT:  I've been patient through a lot more than this.

MR. NUNEZ:  Never been here before, so I have great deference and respect for the Court, I just didn't want that to come across that way.

THE COURT:  No, I didn't want to come across that way, and I'm not sure I did.  But I wanted to make sure that in the end you got to say everything you wanted to say and make every objection and effort on behalf of your client; that's your professional obligation to your client.

MR. NUNEZ:  I did, Your Honor.  Thank you.

I have one more.  Please.  One more objection -- or statement.

THE COURT:  Okay.

MR. NUNEZ:  The government didn't file any briefing

in this case.  I came to court today prepared to argue why he's not an organizer/leader.  Respectfully, I should have been contacted and told the position was changing.  They haven't cited a single case to give Your Honor any precedent to impose such a significant departure based on his conduct.

I think we have a duty to each other, both parties, to announce our positions before a hearing when they've changed so dramatically.  In this case, they concede he's not a leader, organizer, supervisor, manager, but then they backdoor everything seeking essentially the same kind of sentence.  I think it was important to reach out and give me notice so that I could come in here prepared, research the case law, find precedent that perhaps wouldn't warrant such a significant departure.

Thank you.

THE COURT:  Well, you managed to introduce an element of deprivation at the last minute.  I think that the United States and the defense, as a matter of convenience, ought to apprise themselves on an ongoing basis of the other's position to save time and effort, both theirs, the Court's, the probation officer's, and everyone else to simplify the proceedings.  Whether they have an obligation to do that at all times, I'm not sure.

But if I were inclined to grant this dramatic upward departure that the United States has requested, and if you were

to request time to brief it, I not only have done so in the past but would, again, grant you an opportunity to brief it, but your briefing is unnecessary.

In imposing a sentence in the district court, Mr. Hurtado Ibarra, the presiding judge considers a number of factors, including the policies and guidelines of the United States Sentencing Commission, the applicable advisory guideline range, which you heard discussed at great length this morning and finally resolved. I consider the applicable statutory penalties.

I consider the submissions of counsel for both the United States and the defense, both oral and written. And as your counsel just said, he submitted a memorandum addressing the issues that -- or many of them that we've discussed this morning. I consider your statement on your own behalf, which I appreciate.

I consider all of the matters in the record, to the extent that I can perceive them. I am, for instance, not familiar with all the discovery or any of the discovery, unless it was brought to my attention this morning. And I consider the contents of the PSR. I always read the PSR cover to cover and also the other materials that are made available to me or accessible to me, and I did so today.

I also consider the factors at 18 U.S.C. 3553(a), those include the nature of the offense -- let me say there's a

long list of those factors. I'm not going to review them all but I'll mention the more salient ones.

One, the nature of the offense. The presentence report details the extent of your contribution to a series of international transoceanic voyages in which the cargo was large quantities of high purity cocaine, the voyage of course directed to the rich markets of the north, and the ventures take place at the behest of a, I suppose, poorly defined but undoubtedly present criminal organization, combinations and the like. I think we much too much tend to think of corporate structures with formal job descriptions and the like when we think about these things, but these organizations are much less formal, much more changeable, and role characterizations much more difficult.

As I tried to explain earlier, the history of someone's participation and the facts relate that -- that contribute to that history -- or contribute to a detailed description of that history are much more informative to a sentencer than a characterization such as coordinator or facilitator, which are almost totally useless generic terms, such as words -- such, also, is the case with words such as orchestrated. Someone orchestrated something. Well, what in the world does that mean? It's much too conclusional and much too void of factual content, and it leaves an impression but it doesn't create facts. To say that someone was involved in

something, involved is another horrific generality that's used all the time. It means almost nothing. The same people utilize people. Using the term "utilized," that's futile. What does that mean? It could mean almost anything.

But nonetheless, these organizations, we know they're there, we know what they do, we know in general how they do it, and we can see the results at the shoreline sometimes, on the high seas very often, and certainly in the cities and towns of the United States, and we can see the lives that are wrecked as a result. The lives in Colombia, the lives in places in between, and certainly the lives and households in the United States. It's a gruesome and lamentable set of circumstances.

But the crime is a serious one, and in an attempt to resist this criminal activity, the United States Congress has enacted quite a network of statutes, one of which you have run afoul of in this case. These voyages are dangerous to all involved and have been in progress for many years, decades now, three decades that I can talk about as a matter of firsthand information.

As a matter of fact, the first criminal defendant that ever went to trial in this court in a Panama Express case, his name was Ibarra, and he was acquitted. There were eight defendants in that case, two of them were acquitted, the other six were convicted. I have that backwards. Two of them were convicted, the other six were acquitted. Mr. Ibarra was

convicted.  He was the captain.  And I don't suggest there's any connection between you and that Ibarra other than coincidence.

Anyway, the nature of the offense is one factor, the nature of the defendant is another.  I looked at your background and characteristics, to the extent that they are knowable and available to me.  I noted, as counsel did, that you have the benefit of some college education, and had, what is surely in Colombia, an above-average life in terms of material and familial advantages.  In the universe of defendants in these so-called boat cases, your qualifications, including some college and, as counsel said, a functional and loving household and steady employment would put you in the upper echelon for sure.

I also consider a number of other factors, including the imposition of a sentence that is proportionate to the offense and that a fair and disinterested and detached person would view as neither too lenient nor too harsh and therefore would have the effect of enhancing respect for the law for all affected.

I consider protection for the community.  Obviously protection for the community is a primary if not the primary consideration in almost every criminal case, perhaps in every criminal case.

I do consider deterrence.  The statute requires that

I consider it.  I will say that there is a great debate always about when and to what extent deterrence has an effect on criminal conduct.  I think, in general, cases that involve severe, coercive influences -- for example, severe and coercive are less likely to be susceptible to deterrence.  Crimes such as white collar financial crimes where people make careful calculations of gain and loss and risk, I think maybe deterrence is more likely to be effective.  But I have -- although I have considered it, I have not given it material weight here in the matter of this sentence.

MR. NUNEZ:  Your Honor, I have to apologize.  Because I was unprepared for this argument, I missed one thing.  It might make a difference.  If I could just make one more statement before you impose sentence.

THE COURT:  You know, there is a time at which counsel is stopped, and I could reasonably impose that limit now, but I will -- I'll hear you.

MR. NUNEZ:  Thank you, sir.

It was made -- a statement was made that he played an essential role in this conspiracy by controlling the money.  Note 3C of Section B1.2 provides the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.

Thank you.  Thank you.

THE COURT:  I understand that.  Thank you.

MR. NUNEZ:  I wasn't prepared.  I'm sorry.

THE COURT:  If you had been disadvantaged by lack of preparation in some way, I would rather you not say that now. If you wanted an opportunity to prepare as to any matter and you are disadvantaged, just let me know and I will see what remedy I have remaining to me.

MR. NUNEZ:  I'm ready to proceed, Your Honor.  Thank you.

MS. STOIA:  May I, Your Honor?

THE COURT:  Yes.

MS. STOIA:  Early in the pendency of this case, counsel and I had extensive conversations over the phone.  And my initial reaction was counsel may be right and I would likely ask for an upward departure based on his control of the assets.

Now, yes, since that time, he and I, to be frank, because I have a tremendous workload at the moment, have not discussed, you know, the intimate details of what I would ask for today.  But the notion that I have completely sandbagged counsel, I think, is inappropriate.  And, furthermore, all of the argument today has really stemmed from aggravating role. And Application Note 2 is on -- it's all on one page under the sentencing guideline.  So, you know, that's all I have to say about that.

THE COURT:  Well, if you stay around as a district judge long enough, everything will happen.  I believe that's

the first time in my 33 years I have ever been interrupted for additional argument in the middle of my announcement of a sentence. Another first is achieved.

As I was saying, I think deterrence is not a significant factor in this case. The guidelines also suggest, as does the statute, I think, that we consider the avoidance of unwarranted disparities. Of course that's a common sense notion that people who are situated about the same way and have the same history and commit the same crime ought to have about the same sentence.

But in the obsessive compulsive fixation on quantitative matters that prevails, we are given oceans of data, and sometimes determining which defendants are comparable, it's difficult -- for instance, there was a reference to one of the two brothers, and he had such and such a sentence. Well, he had such and such a sentence with a four-level departure under 5K1, so that's not a sentence that you would look to with respect to his guideline calculation, because it wouldn't be comparable to this defendant, who does not have a four-level downward departure for substantial assistance. That can be a little complex.

Some people become fixed on co-defendants or co-conspirators or the like, that's not really the primary base of comparators for the purpose of finding unwarranted disparity. Actually, it is the more aggregated data that is

available, for example, through the sentencing commission, to determine what a typical defendant similarly situated receives.

Happily, in the instance of these South America to North America transoceanic boat cases, a highly disproportionate number of those are sentenced right here in Tampa in the Middle District of Florida, and some of us have probably sentenced more than any others.  So I'm familiar on a firsthand basis with the typical sentences in these cases, and any sentence that I impose will not create any unwarranted disparities, at least one that enures to the detriment of the defendant.

I will say one of the problems we have in sentencing these cases is illustrated by the fact that not 100 percent but well in excess of 95 percent of these defendants in these boat cases, which typically are from Colombia or Ecuador, occasionally from some of the surrounding countries, are Criminal History Category I offenders, not because we are aware of their criminal history and can confirm that they have no criminal record but because we can't know their criminal record and they get the benefit of being Criminal History Category I offenders.

Similarly, it's very hard to determine the factual detail in these cases.  For instance, today, we had no witnesses, the case agent was not here, and the amount of factual material that the presiding judge has on which to base

a sentence is limited, and I think that has an effect here, it has an effect on the sentence here today.

But to the extent that I have facts before me, and to the extent that I have considered the record in its entirety, and for the reasons that I have stated earlier, I have determined, pursuant to the Sentencing Reform Act of 1984, to the extent applicable after *United States versus Booker*, and pursuant to 18 U.S.C. 3553, that Jose Alfredo Hurtado Ibarra is committed to the Bureau of Prisons for a term of 135 months.

Upon release, the defendant must serve a five-year term of supervised release during which he must comply with the mandatory and standard conditions adopted by the Court in the Middle District of Florida and appearing at Sections 5D1.3(a) and (c) of the sentencing guidelines.

In addition, the defendant must comply with the special condition that if he is deported he must not reenter the United States without the express permission of the Attorney General of the United States or the Attorney General's delegate.

As a qualifying felon, the defendant must cooperate in the collection of his DNA as directed by the probation officer.

Has that been accomplished?

MS. FOGG:  Yes, Your Honor.

THE COURT:  Thank you.

I will suspend the mandatory drug testing requirements and I will waive the imposition of a fine.

I am required to levy the special assessment of $100, which is due immediately.

For the reasons that I have stated earlier and with the limitations that I have stated earlier, I conclude that the announced sentence is sufficient but not greater than necessary to comply with the statutory purposes of sentencing and is altogether reasonable in the circumstances.

Does counsel for the United States or the defense object to the sentence or the manner in which it was announced for any reason not already stated on the record?

Ms. Stoia?

MS. STOIA:  No, Your Honor.

THE COURT:  Mr. Nunez?

MR. NUNEZ:  No, sir.

THE COURT:  The defendant is remanded to the United States Marshal to await designation by the Bureau of Prisons.

Did you have a request with respect to his residence?

MR. NUNEZ:  Yes.  Thank you, Your Honor.  FCI Miami.

THE COURT:  I recommend that he be housed at FCI Miami.

You do have a right, sir, to appeal from this judgment and sentence.  With respect to any appeal, I need to tell you two things.

Number one, you always have a right to counsel on direct appeal.  If you can't afford counsel, I would appoint one for you at public expense.  As it stands now, Mr. Nunez must preserve and pursue any appeal unless and until other counsel is substituted for him by an order of the Court.

Number two, to begin an appeal, you must file with the clerk of this court a written notice of appeal that is filed within 14 days and that is accompanied by a filing fee.  If you haven't the money to pay the fee, Mr. Nunez can ask the Court to waive the fee, and if that's granted you can appeal without payment.

Anything further from the United States?

(Off-the-record discussion.)

MR. NUNEZ:  Yes.  Thank you.

The government pointed out that Mr. Ibarra requested to learn English in the prison and take vocational classes, if Your Honor could recommend both.

THE COURT:  I can recommend both, and I think those will be available to him.

MR. NUNEZ:  Thank you.

THE COURT:  Anything further from the defense?

MR. NUNEZ:  No, sir.

THE COURT:  All right.  We are in adjournment.

(Whereupon, the Court adjourned at 10:53 a.m.)

--oo0oo--

## REPORTER'S CERTIFICATE

I, REBECCA M. SABO, a Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Tampa, Florida, this 5th day of November, 2025.


/s/ Rebecca M. Sabo

Rebecca M. Sabo, RMR, CRR
Federal Official Court Reporter